Fred D. Jackson and Alice P. Jackson v. Commissioner.
Jackson v. Commissioner
Docket No. 109350.
United States Tax Court
1944 Tax Ct. Memo LEXIS 223; 3 T.C.M. (CCH) 517; T.C.M. (RIA) 44189; June 1, 1944
*223 T. H. Canfield, Esq., and George G. Witter, Esq., 453 S. Spring St., Los Angeles, Calif., for the petitioners. W. Frank Gibbs, Esq., and Earl C. Crouter, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined a deficiency in income tax against the petitioners for the year 1937 in the amount of $8,215.91. The only issue presented is whether certain shares of stock became worthless during the taxable year. Findings of Fact Petitioners Fred D. Jackson and Alice P. Jackson are husband and wife, and residents of Santa Barbara, California. They filed a joint income tax return for 1937 with the Collector of Internal Revenue at Los Angeles. Between 1925 and 1931, the petitioners acquired 492 1/2 shares of preferred stock of the Mortgage Securities, Inc., for sums aggregating $46,337.20, 487 1/2 shares being issued to petitioner Fred D. Jackson and 5 shares to his wife, Alice P. Jackson. Mortgage Securities, Inc., sometimes called the Mortgage Company, was incorporated under the laws of California in December 1922, with its principal place of business at Santa Barbara, California. It operated as an investment company, buying *224 and selling real estate and mortgages and issuing its own investment securities. Under its plan of operation, it would deposit securities which it had acquired with a depositary and would sell to the public its own mortgage certificates, which were secured by the securities held by the depositary. Pursuant to a permit issued by the State Commissioner of Corporations, the Mortgage Company, on January 24, 1925, executed an indenture with the Security Title Insurance and Guarantee Company to act as depositary. The indenture required that the mortgage certificates issued by the Mortgage Company be secured by first mortgages and first deeds of trust deposited with the depositary in the face amount of $110 for each $100 mortgage certificate issued. The Mortgage Company was also required, on demand of the holders thereof, to repurchase any mortgage certificates outstanding. The depositary was required to authenticate each mortgage certificate issued by the Mortgage Company, to show that the terms of the indenture had been complied with. The indenture also provided that in the event of certain defaults on the part of the Mortgage Company, the depositary should take over all of the assets *225 of the Mortgage Company, notify the certificate holders, and operate the properties so taken over for their benefit. Petitioner Fred D. Jackson and a man by the name of W. S. Porter were two of the incorporators of the Mortgage Company. They owned all of its common stock and together dominated and controlled its affairs. In the beginning, Porter was president and Jackson was vice president; Porter was also vice president of the Security Title Insurance and Guarantee Company, depositary under the indenture above, and manager of that company's office in Santa Barbara until 1928 or 1929, when he was transferred to Los Angeles. Up to the time of Porter's transfer to Los Angeles, the business of the Mortgage Company was carried on from the Santa Barbara office of the depositary. After his transfer, Jackson became president of the Mortgage Company and dominated and controlled its affairs. Both Porter and Jackson were members of the company's board of directors. After Porter's departure for Los Angeles, the affairs of the Mortgage Company were conducted from the personal offices of petitioner Fred D. Jackson. In 1930 the Mortgage Company obtained shortterm loans from the First National *226 Trust and Savings Bank and the County National Bank & Trust Company, both of Santa Barbara, in the aggregate amounts of $50,000 and $30,000, respectively. In September 1931, it was still indebted to the two banks in the amounts stated, and was also heavily indebted to various persons. It had a large operating deficit and was unable to pay its indebtedness or any part thereof, or to make any adjustments satisfactory to the banks. Such being the circumstances, the banks were insisting that they be represented on its board of directors. A conference between Jackson, Porter and the other directors of the Mortgage Company was held on September 25, 1931, at which time the financial condition of the company and the demands of the two banks were discussed. This conference was followed by a meeting of the board of directors on September 28, at which a new manager was appointed and representatives of the two banks were elected to the board of directors. Jackson and the other officers resigned. The new president shortly thereafter moved the offices of the Mortgage Company from Jackson's personal offices to new quarters. After the conference of the directors on September 25, 1931, and prior *227 to the meeting of the board of directors on September 28, 1931, Jackson, without notice to any other officers or directors, caused J. F. Ewing, one of his personal employees, to execute a fictitious executory contract with the Mortgage Company, whereby Ewing purported to purchase from the company, at a price of $54,465.80, 19 parcels of real property which were carried on the company's books at $51,501.50. Jackson caused an appraisal of the property involved to be made by an interested party and filed an appraisal report with the depositary showing the appraised value of the property to be $115,000. At September 28, 1931, ten accounts of questionable or doubtful validity, showing a net balance owing by the Mortgage Company in the amount of $125,000, were being carried on the books of the Mortgage Company. These accounts had been set up at the direction of Jackson. Seven were in the name of Associated Almond Growers Company, of Paso Robles, two in fictitious names, and one in the name of Alice P. Jackson. Jackson was president of the Associated Almond Growers Company. During the noon intermission of the meeting of the board of directors on September 28, 1931, and in anticipation of *228 the change made that day in the management of the Mortgage Company, Jackson caused a journal entry to be made on the books of the company transferring the net credit balance of $125,000, appearing in the above accounts, to Jane V. Reinert. Jane V. Reinert was a friend of Jackson, and her husband was an officer of the Associated Almond Growers Company and a partner of Jackson in other interests. The transfer was effected by charging Contracts Receivable Seconds in the amount of $125,000 and crediting Suspense with $3,500 and Customers' loans Jane V. Reinert a-c-No. 1353 with $53,000, and by issuing First Mortgage Certificates 443 to 451, inclusive, in the face amount of $68,500 to Jane V. Reinert. As a result of the entries made, the ten accounts as they appeared on the books of the Mortgage Company on September 28, 1931, were closed out. The mortgage certificates were issued to Jane V. Reinert without any payment from her, and Jackson caused the assistant secretary of the depositary to authenticate them although the Santa Barbara manager of the depositary had been ordered by the officers of the depositary at Los Angeles not to certify any additional certificates because of the unstable *229 financial condition of the Mortgage Company. Jackson did not report any of his actions to the board of directors or to the banks, and they were not disclosed until an audit of the affairs of the Mortgage Company was made in December 1931. On September 28, 1931, the Mortgage Company had on deposit with the depositary collateral securities, including the Ewing contract, in the total amount of $189,075.25. Of the securities on deposit, however, only $88,180.15 were first trust deeds and first mortgages, as required by the indenture and by the permit which had been issued by the Corporation Commissioner. The Mortgage Company had outstanding on that date mortgage certificates, including the Reinert certificates, in the total amount of $169,270.45. After the appointment of the new manager and the election of new officers on September 28, 1931, the affairs of the Mortgage Company continued under the management of the new board until June 4, 1932. On June 4, 1932, the depositary, under a provision of the indenture, gave notice of various defaults on the part of the Mortgage Company and took over all of the Mortgage Company assets. The Mortgage Company had failed to pay the interest on outstanding *230 certificates, to repurchase certificates on the demands of the holders thereof, and to keep collateral of the type and character required by the indenture in the hands of the depositary sufficient to cover the mortgage certificates outstanding. In September following the taking of the affairs of the Mortgage Company by the depositary, the banks' representatives on the board of directors of the Mortgage Company resigned. In 1933 the two banks, through their assignee, F. Virginia Kaysser, and in an effort to recover the amount owing to them by the Mortgage Company, instituted a stockholders' liability action against several officers of the Mortgage Company, including the petitioners. Later in 1933, and independent of the suit instituted by the banks, L. P. Feldmeier and others, for holders of mortgage certificates outstanding, instituted a second suit against the Mortgage Company, the depositary, Jane V. Reinert and others for the enforcement of their rights under the mortgage certificates. Through interventions, cross-complaints and other pleadings, other parties, including the petitioners, were joined. The petitioners, among other things, charged mismanagement of the affairs of the *231 Mortgage Company during its operation by the depositary. Trial of the certificate holders' suit was had in 1936, but judgment was not rendered until October 1937. As a result of the suit, the contentions of the mortgage certificate holders were upheld, except as to Jane V. Reinert, whose certificates 444 to 450, inclusive, were declared to be invalid. Certificates 443 and 451 had been paid by the company immediately after the transactions of September 28, 1931, thereby reducing the amount of certificates issued to Jane V. Reinert from $68,500 to $52,150. After judgment in the Feldmeier suit the petitioners compromised the stockholder's liability suit brought against them by the banks by payment of $13,500. On May 9, 1938, the First National Trust and Savings Bank and three individuals filed a petition in the United States District Court for the Southern District of California for involuntary bankruptcy of the Mortgage Company. Among the claimants was Alice W. Jackson, daughter of petitioners, who had purchased a $5,000 note of the Mortgage Company, payable to Winsor Soule, a director, on which she had filed suit to enforce collection, and which suit was pending when the bankruptcy *232 proceedings were instituted. The bankruptcy matter was closed out in 1940 through the payment of 10 percent on the claims of creditors, the claims of Alice W. Jackson and Jane V. Reinert and others having been withdrawn. The stockholders received nothing. The corporation income and excess profits tax return of the Mortgage Company for the year 1935, reporting no gross income, no deductions and no net income, was filed on January 6, 1937. The return carried a balance sheet as of the beginning of the taxable year but none as of the end of the year. The assets and liabilities of the company as stated in the balance sheet were as follows: ASSETS
Cash
$ 827.08
Notes receivable
105,753.71
Accounts receivable: Less reserve for bad debts
13,195.61
Deferred charges: Stock commission
714.19
Capital assets: Furniture and fixtures
$ 3,856.35
Less reserve for depletion
3,483.58
372.77
Other assets: Real Estate
307,362.07
Stock premiums
100,000.00
407,362.07
Total assets
$528,225.43
LIABILITIES AND CAPITAL
Accounts payable
3,966.37
Bonds, notes, and mortgages payable (with original maturity of less than 1 year)
90,000.00
Bonds, notes, and mortgages payable (with original maturity of 1 year or more)
261,103.42
Other liabilities: Deferred items
$ 634.29
Unearned discount
8,861.58
9,495.87
Capital stock: Preferred stock
300,400.00
Common stock
100,000.00
400,400.00
Paid-in or capital surplus: Capital stock premium
5,925.00
Earned surplus and undivided profits
(red) 242,665.23
236,740.23 (red)
Total liabilities and capital
$528,225.43
*233 Corporation income and excess profits tax returns were filed for the Mortgage Company for the years 1936 and 1937 on March 15, 1937, and September 30, 1938, respectively. Each of these returns stated on its face "No income. No deductions. No cash or other transactions during the entire year." The 1936 and 1937 returns carried exactly the same balance sheet as that shown above from the 1935 return. Contrary to the statements appearing on the income tax returns of the Mortgage Company for the years 1935, 1936 and 1937, it did receive some income during those years. Pursuant to the terms of the indenture its affairs were being managed by the depositary for the benefit of the mortgage certificate holders, and collections were made during the years in question, which included some items of income, the total income not being definitely ascertainable. Included among the receipts were royalties from the production of four oil wells, located on three of the lots owned by the Mortgage Company. During the years 1935, 1936, 1937 and 1938 oil royalties of $6,851.99, $981.92, $230.74 and $72.83, respectively, were received. The field was a poor one, and oil production fell off rapidly, one of *234 the wells being abandoned in 1936, two in 1937 and the other in 1940. At December 31, 1936, the total assets of the Mortgage Company consisted of cash, real estate, a few trust deeds and minor items. The cash amounted to $28,634.52, the real estate had a value not in excess of $162,070, while the other assets amounted to $16,350.66, or a total for all assets not exceeding $207,055.18. On the same date the mortgage certificates outstanding and the interest accrued thereon and the bank loans plus accrued interest totaled $306,370.55. In addition, there were admitted miscellaneous liabilities of $10,127.34, as well as some claims of small amounts. Making allowance for the Reinert certificates, in the amount of $52,150, which were later found to be invalid, plus interest attributable thereto, the liabilities of the Mortgage Company, at December 31, 1936, exclusive of capital stock were substantially in excess of the assets. The petitioners in their joint return for 1937 reported total income of $45,795.26. They claimed total deductions in the amount of $47,489.26, the principal deduction being a loss deduction in the amount of $46,337.20, the cost of the 492 1/2 shares of Mortgage Company *235 preferred stock. The deduction was based on the claim that the said shares became worthless in 1937. The stock loss deduction so claimed was disallowed by the respondent in his determination of the deficiency herein. The 492 1/2 shares of preferred stock of the Mortgage Company owned by the petitioners became worthless prior to 1937. Opinion The petitioners in 1937 filed a joint income tax return, on which they claimed as a loss deduction the amount of $46,337.20, representing the cost to them of 492 1/2 shares of preferred stock of Mortgage Securities, Inc. The basis for the claimed deduction was that the stock became worthless in 1937. The deduction so claimed was disallowed by the respondent in his determination of the deficiency herein. After considering the evidence of record, we have concluded and found as a fact that the stock in question was worthless prior to 1937. Such being the case the loss claimed was not sustained by the petitioners in the taxable year. The respondent's disallowance of the deduction claimed is accordingly sustained. The petitioners on their return reported as income from salaries or other compensation for personal services the sum of $17,500. The *236 respondent, in his determination of the deficiency, increased that amount by $3,250. At the hearing counsel for the respondent conceded that the respondent's action in so increasing the petitioner's taxable income should be reversed. Decision will be entered under Rule 50.